THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DeCAR-LOS MORROW, Defendant-Appellant.

Fifth District    No. 5—92—0694

Opinion filed March 21, 1995.

Daniel M. Kirwan and Rita K. Peterson, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Robert Haida, State's Attorney, of Belleville (Norbert J. Goetten, Stephen E. Norris, and Rebecca Sanders, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE MAAG delivered the opinion of the court:

After a jury trial in the circuit court of St. Clair County, defendant, DeCarlos Morrow, was convicted of the murder of Lynne Thomas. The court found that there existed statutory aggravating factors, in that the murder was committed in the course of a robbery and in the course of an attempted or completed aggravated criminal sexual assault. The court sentenced the defendant to a term of natural life in prison. Defendant appeals his conviction and sentence. We affirm.

On December 16, 1990, Lynne Thomas was found dead in the storeroom of the Everything's A Dollar store at St. Clair Square in Fairview Heights, Illinois. The cause of death was ligature by strangulation as a result of plastic bags being tied around the victim's throat and her head and face being encased in a plastic bag secured with an adhesive noose. The victim also showed signs of having been sexually assaulted.

An investigation by Fairview Heights police led to an all-points bulletin being issued for defendant, who was an employee of the store. Defendant was arrested in the early morning hours on December 18, 1990, in St. Louis, Missouri. During an interview with police detectives from St. Louis and Fairview Heights, he confessed to the crime. He later agreed to allow the police to videotape his confession. He was then charged with first-degree murder.

On November 19, 1991, defendant filed a motion to suppress his confession. A hearing on the motion was held, written arguments were submitted, and on January 7, 1992, the trial court denied defendant's suppression motion. Subsequently, the State showed the videotape of defendant's confession to the jury.

On August 12, 1992, during *voir dire*, defendant made a motion to strike the jury panel, claiming that the State was using its peremptory challenges in a racially discriminatory manner. The court denied this motion, finding that defendant had not made a *prima facie* case.

The court instructed the jury on first- and second-degree murder, and defendant was found guilty of first-degree murder on August 18, 1992. The jury found defendant eligible for, but did not impose, the death penalty. On October 8, 1992, the court sentenced defendant to a term of natural life in prison. Defendant's post-trial motions for a new trial and to reconsider sentence were denied.

Defendant raises four issues on appeal:

(1) The trial court erred in denying defendant's motion to suppress his confession, because police did not scrupulously honor defendant's exercised right to remain silent;

(2) The trial court erred in finding that defendant failed to present a *prima facie* case of racial discrimination based upon the State's use of its peremptory challenges;

(3) The second-degree murder statute (720 ILCS 5/9—2 (West 1992)) violates defendant's rights to due process under the Illinois Constitution as it places the burden on the accused to prove that he is guilty of a lesser offense and not guilty of the greater offense; and

(4) The trial court abused its discretion in sentencing defendant to a term of natural life in prison thereby rejecting defendant's potential for rehabilitation.

At approximately 1:25 a.m. on December 18, 1990, St. Louis police officer Joseph Dudley stopped and arrested defendant in St. Louis, Missouri. Dudley testified that he advised defendant that he was under arrest for a homicide occurring in Illinois. Dudley read defendant his *Miranda* rights, and defendant indicated that he understood his rights and did not want to make any statements or talk at that time. Dudley then delivered defendant to the Area II police station and notified the major case squad of defendant's arrest. Defendant did not request counsel.

At approximately 2 a.m., St. Louis Detective Matthew Sheetz of the major case squad took defendant to an interview room. Sheetz testified that Dudley informed him that defendant had been read his *Miranda* rights, but Dudley did not tell Sheetz that defendant had exercised his right to remain silent. When asked by Sheetz if he had been read his rights, defendant indicated that he had not. Sheetz then advised defendant of his *Miranda* rights around 2:10 a.m., and defendant indicated that he understood his rights. Again, defendant did not request counsel. Sheetz left defendant alone in the interview room without asking him any questions.

At approximately 2:30 a.m., Fairview Heights Detective Martin McCoy arrived to interview defendant. McCoy, who was leading the interview along with Sheetz, began by reading defendant his rights, and defendant did not request counsel. The defendant again indicated that he understood his rights. He signed a waiver of his rights and agreed to speak with the detectives. The interview lasted about an hour, and then all parties took a break. Defendant was offered but refused food and the use of a restroom.

At approximately 3:51 a.m. detectives resumed the questioning of defendant. During the break, the detectives learned that a fingerprint

had been found in the latex glove left at the scene and that defendant was placed at the scene by his companion. Before imparting this knowledge to defendant, Detective McCoy again advised defendant of his *Miranda* rights. The defendant agreed to talk and was interviewed until 4 a.m.

At 4 a.m. the officers took another break and offered food and a restroom to defendant. This break lasted 30 minutes, and they returned at approximately 4:36 a.m. Using another consent form, the detectives again advised defendant of his rights. The defendant initialed each section of the form indicating he understood his rights, and he agreed to continue talking with the police. He did not request an attorney and did not exercise his right to remain silent.

During the interview, defendant agreed to make a written statement, which defendant dictated to Detective McCoy. McCoy read the statement back to defendant, and defendant indicated his understanding and agreement by signing the statement. At 5:20 a.m., the officers took a break and again offered defendant food or a restroom. The defendant requested the use of a telephone and was permitted to make a call.

After the break, the detectives asked defendant if he would videotape his statement. He agreed to do so. Police videotaped his statement at approximately 6:20 a.m. On January 4, 1991, the State charged defendant with first-degree murder. 720 ILCS 5/9—1(a) (West 1992).

Defendant contends that the trial court erred in denying his motion to suppress his confession. He argues that the confession should be suppressed under *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, on the ground that police improperly obtained his confession after he indicated a desire to remain silent at the time of arrest. He argues that the frequent repetition of *Miranda* warnings while in custody served only to show that police detectives would continue to interrogate him even if he did not wish to make a statement.

In *Miranda*, the United States Supreme Court held that if during custodial interrogation an individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. (*Miranda*, 384 U.S. at 473-74, 16 L. Ed. 2d at 723, 86 S. Ct. at 1627.) "[A]ny statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise." *Miranda*, 384 U.S. at 474, 16 L. Ed. 2d at 723, 86 S. Ct. at 1628.

In *Michigan v. Mosley* (1975), 423 U.S. 96, 46 L. Ed. 2d 313, 96 S. Ct. 321, however, the Court rejected the argument that *Miranda* established a *per se* proscription on the renewal of questioning by po-

lice following a defendant's initial request to remain silent. The Court held that later statements made by a suspect when he earlier expressed a desire to remain silent are admissible if the police "scrupulously honor" the suspect's "right to cut off questioning." *Mosley*, 423 U.S. at 104, 46 L. Ed. 2d at 321, 96 S. Ct. at 326.

In *Mosley*, in determining that the defendant's right to remain silent had been scrupulously honored, the Court noted that the defendant had been fully and carefully advised of his rights before his initial interrogation; that he had then signed a waiver form; and that when he stated that he did not wish to discuss the robberies in question, the police officers immediately ceased the interrogation and made no attempt to persuade him to alter his decision. After an interval of two hours, defendant was questioned again by a different police officer at another location about an unrelated crime, after being given another full set of *Miranda* warnings. *Mosley*, 423 U.S. at 104-05, 46 L. Ed. 2d at 321-22, 96 S. Ct. at 327.

The record here shows that the defendant's right to remain silent was "scrupulously honored." The evidence at the suppression hearings held on December 11, 1991, and December 20, 1991, was that defendant exercised his right to remain silent after being advised of his *Miranda* rights by the arresting officer at the time of arrest at approximately 1:25 a.m. The record also shows that defendant was again advised of his *Miranda* rights at approximately 2 a.m. by Detective Sheetz while waiting in an interview room at the stationhouse. In neither situation did either officer ask any other questions of defendant except to inquire whether or not defendant understood his rights. Neither of these instances was a "custodial interrogation" of defendant in the constitutional sense because the questioning did not constitute "words or actions on the part of the police *** that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Rhode Island v. Innis* (1980), 446 U.S. 291, 301, 64 L. Ed. 2d 297, 308, 100 S. Ct. 1682, 1689.) Rather, each officer was advising defendant of his *Miranda* rights merely to verify that defendant knew his rights and not as a prelude to an interrogation. *People v. Lane* (1993), 256 Ill. App. 3d 38, 53, 628 N.E.2d 682, 692.

The first custodial interrogation of defendant in the constitutional sense took place when Detectives McCoy and Sheetz began to interview defendant at approximately 2:30 a.m. Defendant chose not to remain silent. He agreed to talk with detectives. Furthermore, defendant signed a form indicating that he had been informed of and understood his *Miranda* rights, and he signed a waiver of those rights. Thus, defendant made a knowing, intelligent, and voluntary waiver of his rights prior to his confession. (See *Edwards v. Arizona* (1981),

451 U.S. 477, 482, 68 L. Ed. 2d 378, 385, 101 S. Ct. 1880, 1883-84.) Therefore, defendant's confession was admissible.

■ The result would be the same even if we were to find that defendant invoked his right to remain silent during a custodial interrogation on the street by the arresting officer at 1:25 a.m. The Illinois Supreme Court, in keeping with *Mosley*, has held that there are four factors a court must consider in determining whether the defendant's invocation of his right to remain silent has been fully respected and scrupulously honored. Those factors are: (1) whether a significant amount of time had elapsed between interrogations; (2) whether the subsequent interrogation was by a different officer; (3) whether the subsequent interrogation was prefaced by fresh *Miranda* warnings; and (4) whether the subsequent interrogation involved a matter unrelated to the subject of the first interrogation. *People v. R.C.* (1985), 108 Ill. 2d 349, 353-54, 483 N.E.2d 1241, 1243-44.

Under our earlier analysis, Sheetz's rereading of the *Miranda* rights to defendant at 2 a.m. without asking any other questions is not an interrogation. (*Lane*, 256 Ill. App. 3d at 53, 628 N.E.2d at 692.) Therefore, we apply the test stated in *People v. R.C.* to the 2:30 a.m. interrogation by Detectives McCoy and Sheetz. The voluntariness of a later statement is determined by examining the totality of the circumstances. *People v. Reyes* (1989), 181 Ill. App. 3d 246, 255, 536 N.E.2d 990, 996.

■ The first factor is whether or not a significant amount of time lapsed between custodial interrogations. The record indicates that defendant was arrested and first interrogated at 1:25 a.m. by Officer Dudley. He was not approached for interrogation again until approximately 2:30 a.m. by Detective McCoy. We believe that the 55-minute interval between the questioning by Dudley and the questioning by McCoy was long enough to satisfy the requirement that a significant lapse of time must expire between interrogations. *Reyes*, 181 Ill. App. 3d at 256, 536 N.E.2d at 996 (55-minute interval between questioning by the Indiana police and questioning by the Chicago police was not an insignificant period of time as a matter of law); *People v. Ferguson* (1981), 102 Ill. App. 3d 702, 712, 429 N.E.2d 1321, 1328 (50-minute interval is significant); *People v. Gray* (1991), 212 Ill. App. 3d 613, 616, 571 N.E.2d 489, 492 (one-hour interval is significant).

The second factor is whether or not the subsequent interrogation was by a different police officer. The record indicates that Officer Dudley first interrogated defendant and that Detective McCoy led the subsequent interrogation. Clearly these were different officers. The fact that different officers conducted the requestioning supports

the determination that defendant's rights were scrupulously honored. *Reyes*, 181 Ill. App. 3d at 256, 536 N.E.2d at 996.

The third factor is whether or not police prefaced the subsequent interrogation with fresh *Miranda* warnings. Here, the record indicates that McCoy began the 2:30 a.m. interview by advising defendant of his *Miranda* rights and ascertaining that defendant understood his rights. The defendant demonstrated his knowledge and understanding by signing a waiver of his rights before agreeing to answer any questions.

Finally, with respect to the fourth factor, even if this case did involve a subsequent interrogation involving a matter related to the subject of the first interrogation, that factor does not in and of itself mean that defendant's *Miranda* rights were violated. (*People v. Foster* (1987), 119 Ill. 2d 69, 518 N.E.2d 82.) In *Foster*, the court held that police may later question a defendant regarding the same crime and still scrupulously honor defendant's right to remain silent. *Foster*, 119 Ill. 2d at 86-87, 518 N.E.2d at 90.

In the instant case, there is no evidence of deliberately coercive or improper tactics. On the contrary, it appears that the authorities took every precaution to protect defendant's rights. Defendant had in fact been fully advised of his *Miranda* rights prior to every contact with police. His confession appears knowing, intelligent, and voluntary in all respects.

We find that the defendant's right to remain silent was fully respected and scrupulously honored and that his confession was voluntary. The trial court's denial of defendant's suppression motion was not against the manifest weight of the evidence and therefore will not be disturbed on appeal. *People v. Brown* (1990), 136 Ill. 2d 116, 125, 554 N.E.2d 216, 220.

We now address the remaining issues raised by defendant. The first issue he raises is whether the trial court's finding that he failed to establish a *prima facie* case of racial discrimination under *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, was erroneous. The United States Supreme Court has held that the equal protection clause forbids a prosecutor from peremptorily challenging potential jurors solely on account of race or on the assumption that black jurors as a group will be unable to impartially consider the prosecutor's case against a black defendant. (*Batson*, 476 U.S. at 89, 90 L. Ed. 2d at 83, 106 S. Ct. at 1719.) *Batson* requires a defendant initially to establish a *prima facie* case of discrimination. (*Batson*, 476 U.S. at 93-94, 90 L. Ed. 2d at 85-86, 106 S. Ct. at 1721.) Once the defendant establishes a *prima facie* case, the burden shifts to the prosecution to come forward with race-neutral reasons for striking

the black venire persons. *Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.

To establish a *prima facie* case, a defendant need only prove relevant circumstances which raise a reasonable inference that the State used its peremptory challenges to exclude a member of the venire on the basis of race. (*Powers v. Ohio* (1991), 499 U.S. 400, 416, 113 L. Ed. 2d 411, 429, 111 S. Ct. 1364, 1374.) The Illinois Supreme Court has identified a number of relevant circumstances for the trial court to consider when determining whether a defendant has established a *prima facie* case. These include: a pattern of strikes against black venire persons; the nature of the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges; the disproportionate use of peremptory challenges against blacks; whether the excluded blacks were a heterogeneous group sharing race as their only common characteristic; the level of black representation in the venire as compared to the resulting jury; and the race of the defendant, the victim, and the witnesses. *People v. Mahaffey* (1989), 128 Ill. 2d 388, 413, 539 N.E.2d 1172, 1184; *People v. McDonald* (1988), 125 Ill. 2d 182, 196, 530 N.E.2d 1351, 1357; *People v. Evans* (1988), 125 Ill. 2d 50, 63-64, 530 N.E.2d 1360, 1365.

The trial court's finding that defendant failed to make a *prima facie* case of discrimination will not be reversed unless it is against the manifest weight of the evidence. *Mahaffey*, 128 Ill. 2d at 413, 539 N.E.2d at 1184.

■ After a close examination of the record, we conclude that the trial court's finding that defendant failed to establish a *prima facie* case of discrimination was not against the manifest weight of the evidence. In the present case, the record does not indicate and defendant does not argue that the prosecutor engaged in a pattern of strikes against black venire members or that the prosecutor's questions and statements during *voir dire* were discriminatory, nor does the record indicate that the prosecutor used a disproportionate number of peremptory challenges to exclude black persons from the jury. According to the record, the State used only 11 of its allotted 14 peremptory challenges. Five of those were used to strike black venire members, and six were used to strike white venire members.

Defendant also asserts that the venire and jury pool did not reflect the percentage of black people in the population at large. Defendant's argument, however, is not supported by the record. The citations provided by defendant do not refer to stipulated facts or findings by the trial court. They refer to defendant's argument on his motion to dismiss the venire and exhibits offered in support of that motion. Defendant's arguments cannot be substituted for an ade-

quate record. *People v. Turner* (1982), 110 Ill. App. 3d 519, 522-23, 442 N.E.2d 637, 639-40.

We recognize that the five excluded black venire persons were not shown to have any identifying characteristics other than race; however, we do not find that the defendant has established a *prima facie* case of discrimination on these circumstances alone. (*People v. Edwards* (1991), 144 Ill. 2d 108, 154, 579 N.E.2d 336, 354.) Moreover, we find that the prosecutor gave race-neutral reasons for excluding the black venire members when arguments were heard on defendant's motion. (*Edwards*, 144 Ill. 2d at 154, 579 N.E.2d at 354.) Therefore, we affirm the trial court's finding that defendant failed to establish a *prima facie* case under *Batson*.

Defendant next contends that the second-degree murder statute (720 ILCS 5/9—2 (West 1992)) violates his due process rights under the Illinois Constitution by wrongfully placing the burden on him, the accused, to prove that he is guilty of a lesser offense in order to be found not guilty of the greater offense.

■ We defer to the recent Illinois Supreme Court decision on this issue in *People v. Jeffries* (1995), 164 Ill. 2d 104. In *Jeffries*, the court held that the due process clause of the Illinois Constitution does not forbid the legislature from requiring that the defendant prove, by a preponderance of the evidence, the mitigation necessary to reduce the severity of a homicide charge after the State has proven each element of the charged offense. (*Jeffries*, 164 Ill. 2d at 124.) The court arrived at its conclusion after noting that under the present statutory scheme for second-degree murder, section 9—2(c) of the Criminal Code of 1961 (720 ILCS 5/9—2(c) (West 1992)) requires the jury to be instructed that it may not consider whether defendant has met his burden of proof with respect to second-degree murder (the lesser offense) until and unless it first determined that the State has proven each element of first-degree murder (the greater offense) beyond a reasonable doubt. *Jeffries*, 164 Ill. 2d at 124.

Here, the record indicates that the trial court properly instructed the jury, as required by section 9—2(c), that the State must first prove the defendant guilty of first-degree murder beyond a reasonable doubt before the burden shifts to defendant to prove circumstances mitigating his guilt to second-degree murder. Therefore, we find that the court properly applied the statutory scheme as upheld by the Illinois Supreme Court. Accordingly, we reject defendant's argument on this point.

Defendant's final contention pertains to his sentence. Defendant contends that his sentence of natural life is excessive and an abuse of discretion in light of the Illinois constitutional requirement that a

sentence be proportionate to the nature of the offense and measure the defendant's rehabilitative potential. (Ill. Const. 1970, art. I, § 11.) Defendant complains that by imposing natural life the court clearly rejected the possibility of his rehabilitation, a possibility that could be realized, defendant argues, given that he is young, has a family, and has no past record of juvenile delinquency or convictions of violent crimes.

The imposition of a sentence rests within the sound discretion of the trial court, and the trial court's decision will not be reversed absent an abuse of discretion. (*People v. Morgan* (1993), 250 Ill. App. 3d 728, 734, 620 N.E.2d 635, 639.) Where a sentence is within the statutory limits, it will not be set aside on review unless it is manifestly disproportionate to the nature of the offense. (*People v. Costello* (1992), 224 Ill. App. 3d 500, 510, 586 N.E.2d 742, 749.) Defendant concedes that an "enhanced sentence is available" in this case, but he argues that it is not just and equitable, given his potential rehabilitation under the circumstances.

While the defendant's rehabilitative potential is a factor to be considered, the trial court is not required to give greater weight to that consideration than to the seriousness of the offense. (*People v. Fort* (1992), 229 Ill. App. 3d 336, 341-42, 592 N.E.2d 1205, 1210.) The nature of the crime, the protection of the public, deterrence, and punishment all have equal status in the determination of the proper sentence. (*People v. Barnhill* (1989), 188 Ill. App. 3d 299, 315, 543 N.E.2d 1374, 1383-84.) The sentencing court is not required to find that the defendant has no rehabilitative potential before sentencing him to a term of natural life. *Morgan*, 250 Ill. App. 3d at 735, 620 N.E.2d at 639.

■ In the present case, defendant was convicted of strangling and suffocating his victim to death with plastic bags. The trial court found the following factors in aggravation: the offense was committed during the course of a robbery; the offense was committed during the course of an attempted or completed aggravated criminal sexual assault; the cause and manner of the victim's death were brutal and heinous; the defendant exhibited a lack of remorse and an eagerness to celebrate afterwards; and defendant had a criminal history in which he had failed to take advantage of prior opportunities of rehabilitation. With respect to mitigating factors, the record demonstrates that the trial court considered defendant's presentence investigation report, defendant's family and dependents, defendant's young age, and defendant's diminished intellectual capacities. Where a trial court has considered all factors in aggravation and mitigation, we will not reweigh those factors on review. (*People v. Camp* (1990), 201

Ill. App. 3d 330, 340, 559 N.E.2d 26, 33.) A proper sentence is the result of a reasoned judgment based upon the circumstances of each case, and the circuit court judge is in a better position than the reviewing court to determine the appropriate punishment. (*Barnhill*, 188 Ill. App. 3d at 315.) We cannot say that the trial court's sentence of natural life imprisonment was an abuse of discretion.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

CHAPMAN and HOPKINS, JJ., concur.